# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMIL COOPER, | : | |
|     Plaintiff | : | |
| | : | No. 1:17-cv-2064 |
| v. | : | |
| | : | (Judge Kane) |
| LIEUTENANT SHERMAN, et al., | : | |
|     Defendants | : | |

## MEMORANDUM

## I.    BACKGROUND

Pro se Plaintiff Jamil Cooper ("Plaintiff"), initiated the above-captioned action by filing a complaint in this Court pursuant to 42 U.S.C. § 1983 on November 8, 2017 (Doc. No. 1), against Lieutenant Sherman ("Sherman"); Corrections Officer Thompson ("Thompson"); Mark Garman ("Garman"); Corrections Officer Weller ("Weller"); T. Pilosi ("Pilosi"); and John Wetzel ("Wetzel"). Plaintiff alleges that on June 1, 2017, Defendant Thompson retaliated against him for filing a grievance by issuing a false misconduct report. (Id. ¶¶ 38-42.) He further alleges that he was denied due process during his misconduct proceedings (id. ¶¶ 69-77), and that Defendants Sherman, Weller, Pilosi, and Garman conspired to "cover up" Defendant Thompson's actions (id. ¶¶ 111-17). Plaintiff also asserts claims of retaliation and defamation against Defendant Sherman. (Id. ¶¶ 52, 98, 118-22.)

Following the close of discovery, Defendants filed a motion for summary judgment (Doc. No. 65), brief in support (Doc. No. 67), and statement of material facts (Doc. No. 68). Plaintiff subsequently filed a motion to postpone summary judgment (Doc. No. 69), and a motion for an extension of time to respond to the motion (Doc. No. 71), on December 28, 2018. In an Order filed on February 6, 2019, Magistrate Judge Carlson construed Plaintiff's motions as motions to extend the time for filing a response to the motion for summary judgment, granted the motions,

and directed Plaintiff to file his response on or before March 6, 2019.  (Doc. No. 73.)  Plaintiff

filed his brief in opposition (Doc. No. 77) and counterstatement of material facts (Doc. No. 80),

on February 14, 2019.  To date, Defendants have not filed a reply brief.  Accordingly, because

the time period for filing a reply brief has expired, Defendants' motion for summary judgment is

ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that

the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of

the case under applicable substantive law.  Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d

1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 257;

Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d

Cir. 1991).

When determining whether there is a genuine issue of material fact, the Court must view

the facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986

F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992);

White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary

judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his

or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. White, 862 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." M.D. Pa. L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant. These rules apply with equal force to all parties. See Sanders v. Beard,

Civ. No. 09-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (stating that <u>pro</u> <u>se</u> parties

"are not excused from complying with court orders and the local rules of court"); <u>Thomas v.</u>

<u>Norris</u>, Civ. No. 02-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (explaining that

<u>pro</u> <u>se</u> parties must follow the Federal Rules of Civil Procedure).

## III.    DISCUSSION

### A.    Undisputed Facts[1]

On May 31, 2017, Defendant Thompson was assigned to Range 4 in Plaintiff's housing

unit.  (Doc. No. 68 ¶ 2.)  That evening, he was assigned to walk the range and lock cell doors.[2]

(<u>Id.</u> ¶ 3.)  Plaintiff was on his way back to his cell and asked Defendant Thompson not to lock

his cell door.  (<u>Id.</u> ¶¶ 1, 4.)  Defendant Thompson told Plaintiff that he would return to lock his

cell door after he locked down the back side of Range 4.[3]  (<u>Id.</u> ¶ 5.)  When Defendant Thompson

returned, he unlocked Plaintiff's cell door.  (<u>Id.</u> ¶ 6.)  Plaintiff was upset that he had to wait for

---

[1] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  <u>See</u> M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements.  <u>See id.</u>  Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  <u>See id.</u>  Here, Plaintiff has filed a response to Defendants' statement of material facts in compliance with M.D. Pa. L.R. 56.1.  Accordingly, the Court sets forth the undisputed facts above with footnotes setting forth the parties' relevant factual disputes.

[2] Plaintiff maintains that the Housing Sergeant had not called for lockdown yet and so there was no need for Defendant Thompson to be locking cell doors.  (Doc. No. 80 ¶ 3.)

[3] Plaintiff contends that Defendant Thompson stated this only after ignoring "continued calls" from him and his cellmate.  (<u>Id.</u> ¶ 5.)

Defendant Thompson and stated that he was going to submit a grievance against him for his actions. (Id. ¶ 7.) Defendant Thompson then walked away. (Id. ¶ 8.)

That same evening, Plaintiff submitted Grievance Number 681201, claiming that Defendant Thompson was punishing him.[4] (Id. ¶ 9.) The grievance was assigned to Defendant Sherman for a response. (Id. ¶ 10.) The grievance was denied as frivolous.[5] (Id. ¶ 11.) Plaintiff appealed this response to the Facility Manager on June 27, 2017. (Id. ¶ 12.) The initial review response was upheld on July 24, 2017.[6] (Id. ¶ 13.) Plaintiff appealed this response to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Id. ¶ 14.) SOIGA responded that there was nothing in the record indicating that Plaintiff had been harmed in any way. (Id.)

On June 1, 2017, Plaintiff was returning to his cell on Range 4 for evening count after completing his job assignment, which was cleaning the showers in Range 5. (Id. ¶ 15.) When Plaintiff arrived at his cell, the door was locked. (Id. ¶ 16.) On that evening, Defendant Thompson was assigned to hand out Ramadan feast passes to inmates on Range 4. (Id. ¶ 17.) Plaintiff asked Defendant Thompson to have his cell door opened. (Id. ¶ 18.) Defendant Thompson responded, "No." (Id. ¶ 19.) Plaintiff was unable to lock into his cell for evening count and received a misconduct authored by Defendant Thompson. (Id. ¶ 20.) The misconduct

---

[4] Defendants assert that Plaintiff claimed that Defendant Thompson was punishing him by making him wait for a shower. (Doc. No. 68 ¶ 9.) Plaintiff maintains that "nowhere in the [grievance] does it mention anything about [him] wanting to take a shower." (Doc. No. 80 ¶ 9.)

[5] Plaintiff maintains that on June 14, 2017, Defendant Sherman approached him and threatened him to withdraw the grievance in an attempt to "[influence] the speech of the Plaintiff and chill [P]laintiff's speech." (Doc. No. 80 ¶ 11.)

[6] Defendants assert that Defendant Garman, the Facility Manager, issued this response. (Doc. No. 68 ¶ 13.) Plaintiff maintains that the response was made by Deputy Superintendent Morris Houser. (Doc. No. 80 ¶ 13.)

stated that he had watched Plaintiff "stopping at multiple cells, which caused Plaintiff to miss lock down and interfere with count." (Id. ¶ 21.)

Plaintiff was offered the opportunity to informally resolve the misconduct, but he chose to appear before a hearing examiner. (Id. ¶ 22.) He appeared before Defendant Pilosi for his misconduct hearing on June 14, 2017. (Id. ¶ 23.) The hearing was then postponed so that Defendant Pilosi could review Plaintiff's witness statement and the relevant video footage. (Id. ¶ 24.) Plaintiff's formal misconduct hearing occurred on June 16, 2017. (Id. ¶ 25.) In her report, Defendant Pilosi noted "that the video evidence from June 1st shows Plaintiff walking past his cell and stopping at another cell for two minutes, then run past his cell and up to Range 5."[7] (Id. ¶ 26.) During the hearing, Plaintiff changed his plea from not guilty to guilty.[8] (Id. ¶ 27.) As sanctions, Plaintiff lost his job and also received twenty (20) days of cell restriction. (Id. ¶ 28.) Plaintiff appealed, claiming that Defendant Thompson retaliated against him by filing a false misconduct report and that Defendants Pilosi and Weller conspired to cover up the retaliation. (Id. ¶ 29.) The hearing examiner's decision was upheld throughout the appeal process. (Id. ¶ 30.)

---

[7] Plaintiff admits that this is what the report states, but argues that "if [D]efendants would have maintained and preserved the entire footage as was requested by [P]laintiff then the whole story of how the misconduct hearing was held in the attempt to further punish the [P]laintiff and to coverup the indiscretions of Thompson who at that time was a trainee" would have emerged. (Doc. No. 80 ¶ 26.)

[8] Plaintiff admits that he changed his plea but maintains that he changed it under "duress because [he] was told that the alternative was an immediate punishment of [Restricted Housing Unit ("RHU")] time from Defendant Pilosi." (Id. ¶ 27.)

**B.     Defendants' Motion for Summary Judgment**

**1.     Plaintiff's Claims Against Wetzel and Garman**

In his complaint, Plaintiff alleges that Defendant Wetzel failed to employ competent staff, failed to implement policies that protect inmates' First Amendment rights, and failed to train his employees.  (Doc. No. 1 ¶¶ 102-04, 110.)  Plaintiff also maintains that Defendant Garman has created an environment where "it is acceptable to fabricate a [fictitious] misconduct charge against an inmate," and that he has denied due process "by failing to implement a true appeal [review] process."  (Id. ¶¶ 101, 109.)  Defendants assert that they are entitled to summary judgment because Plaintiff has not described how Defendants Wetzel and Garman had any personal involvement in the alleged violations of his rights.

Liability may not be imposed under § 1983 on the traditional standards of respondeat superior.  Capone v. Marinelli, 868 F.2d 102, 106 (3d Cir. 1989) (citing Hampton v. Holmesburg Prison Officials, 546 F.2d 1017, 1082 (3d Cir. 1976)).  In Capone, the court noted "that supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct."  868 F.2d at 106 n.7.  The plaintiff must allege that the defendant was personally involved in the events or occurrences that underlie the claim. See Atkinson v. Taylor, 316 F.3d 257, 270-71 (3d Cir. 2003); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("[a] defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.").  Furthermore, to establish a § 1983 claim for failure to train, "a plaintiff must (1) identify with particularity what the supervising officials failed to do that demonstrates deliberate indifference

and (2) demonstrate a close causal link between the alleged failure and the alleged injury."
Daniels v. Delaware, 120 F. Supp. 2d 411, 423 (D. Del. 2000) (citing Sample v. Diecks, 885
F.2d 1099, 1118 (3d Cir. 1989)). "[T]he inadequacy of . . . training may serve as the basis for
§ 1983 liability only where the failure to train amounts to deliberate indifference to the rights of
persons with whom the [inadequately trained subordinates] come into contact." City of Canton
v. Harris, 489 U.S. 378, 388 (1989).

In his opposition brief, Plaintiff does not challenge Defendants' arguments regarding his
claims against Defendants Wetzel and Garman. The Court agrees with Defendants that
Plaintiff's vague allegations against Defendants Wetzel and Garman are insufficient to impose
liability against them. Moreover, to the extent Plaintiff seeks to hold Defendant Garman liable
due to his responses to Plaintiff's appeals of his grievance and misconduct, he cannot do so, as
participation in after-the-fact review of a grievance or appeal is not enough to establish personal
involvement. See Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state
prisoner's allegation that prison officials and administrators responded inappropriately, or failed
to respond to a prison grievance, did not establish that the officials and administrators were
involved in the underlying allegedly unconstitutional conduct); Rode, 845 F.3d at 1207 (finding
that a supervisory defendant, who, after being informed of the violation through the filing of
grievances, reports or appeals, failed to take action to remedy the alleged wrong was not enough
to show that the defendant had the necessary personal involvement); Ramos v. Pa. Dep't of
Corr., Civ. No. 06-1444, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the
review and denial of the grievances and subsequent administrative appeal does not establish

personal involvement).  For these reasons, the Court will grant summary judgment as to Plaintiff's claims against Defendants Wetzel and Garman.[9]

## 2. Plaintiff's First Amendment Retaliation Claims

Plaintiff alleges that Defendant Thompson retaliated against him for submitting a grievance against him by issuing a false misconduct charge.  (Doc. No. 1 ¶¶ 92-97.)[10]  He also contends that Defendant Sherman retaliated against him by threatening to mark his grievance as frivolous.  (Id. ¶¶ 52, 98.)  Defendants assert that they are entitled to summary judgment because Defendant Thompson could not have been aware of Plaintiff's grievance against him.  (Doc. No. 67 at 16-18.)  They also contend that they are entitled to summary judgment because verbal abuse and harassment do not rise to the level of a constitutional violation.  (Id. at 14.)

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity.  See Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  Id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights."  Id. (quoting Suppon v. Dadonna, 2013

---

[9] Defendants also argue that Plaintiff has failed to allege that Defendant Sherman had any personal involvement in the violations of his rights.  (Doc. No. 67 at 13-14.)  Upon review of Plaintiff's complaint, the Court disagrees.  To the extent that Plaintiff seeks to hold Defendant Sherman liable based upon his response to Plaintiff's grievance, he cannot for the reasons set forth above.  However, as discussed infra, Plaintiff alleges that Defendant Sherman retaliated against him by threatening to mark his grievance as frivolous and also defamed him.

[10] Plaintiff also maintains that Defendants Pilosi and Weller retaliated against him during his misconduct proceedings.  (Doc. No. 1 ¶¶ 99-100.)  The Court characterizes this claim as a due process retaliation claim pursuant to Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002) and, so construed, discusses that claim infra in Part III.B.3.

F.3d 228, 235 (3d Cir. 2000)).  Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him."  Rauser, 241 F.3d at 333-34 (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events.  See Lape v. Pennsylvania, 157 F. App'x 491, 498 (3d Cir. 2005).  Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  If a prisoner establishes a prima facie case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334.  "This is often referred to as the 'same decision defense.'"  Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016).  If the prison officials can make this showing, it defeats the retaliation claim.  See Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002).

### a.    Plaintiff's Retaliation Claim Against Defendant Thompson

Defendants concede that Plaintiff engaged in protected activity by filing a grievance. (Doc. No. 67 at 16 (citing Mitchell v. Horn, 318 F.3d 523 (3d Cir. 2003); Davis v. Goord, 320 F.3d 346 (2d Cir. 2003).)  Moreover, Defendants do not provide any authority regarding the adverse action element of a retaliation claim.  Regardless of this deficiency in Defendants' briefing, the undisputed facts nonetheless establish that Plaintiff received a misconduct from Defendant Thompson and ultimately lost his job and received twenty (20) days of cell restriction

as a result of that misconduct.  (Doc. No. 68 ¶¶ 20-21, 28.)  Thus, the Court finds that Plaintiff

has satisfied the second element for his retaliation claim.  See Wisniewski v. Fisher, 857 F.3d

152, 157 (3d Cir. 2017) (noting that "the termination of prison employment constitutes adverse

action sufficient to deter the exercise of First Amendment rights"); Chruby v. Kowaleski, No.

11-225J, 2012 WL 12875987, at *4 (W.D. Pa. June 5, 2012) (noting that receipt of cell

restriction time constitutes adverse action), aff'd by 534 F. App'x 156 (3d Cir. 2013).

With respect to the third element, Defendants contend that Defendant Thompson's

"action of issuing a misconduct could not have been motivated by Plaintiff's grievance."  (Doc.

No. 67 at 17.)  According to Defendants, Defendant Thompson would not have known about

Plaintiff's grievance until five (5) days after issuing the misconduct, when it was received by the

grievance coordinator.  (Id. at 17-18.)  The undisputed facts, however, establish that on the

evening of May 31, 2017, Plaintiff told Defendant Thompson that he was going to submit a

grievance against him.  (Doc. No. 68 ¶ 7.)  Moreover, Plaintiff submitted the grievance that same

evening.  (Id. ¶ 9.)  As Plaintiff correctly notes, the United States Court of Appeals for the Third

Circuit recently concluded that it could not "discern a substantive distinction between retaliation

for informing prison officials of an intent to file a grievance or requesting the necessary forms to

do so on the one hand, and actually filing such a grievance on the other."  Watson v. Rozum, 834

F.3d 417, 423 (3d Cir. 2016).  Thus, the undisputed facts establish that Defendant Thompson was

aware that Plaintiff intended to file a grievance against him.

In support of their motion for summary judgment, Defendants have provided copies of

the documents relating to Plaintiff's grievance as well as the misconduct issued against him by

Defendant Thompson.  (Doc. No. 65-1, Exs. A, C.)  In the misconduct, Defendant Thompson

wrote that on June 1, 2017, he observed Plaintiff "stopping at multiple cells on 5-Range both

prior to & after [he] cleaned the 5-Range showers." (Doc. No. 65-1, Ex. C.) This caused Plaintiff "to miss lockdown for 1600 count & interfere with count." (Id.) Defendants have also provided approximately three (3) minutes of surveillance video from June 1, 2017.

In response to Defendants' motion for summary judgment, Plaintiff has submitted a declaration in which he sets forth a different series of events for June 1, 2017. (Doc. No. 77-1, Ex. A.) He avers that on that evening, he was standing outside of his cell door while Defendant Thompson was passing out Ramadan feast passes. (Id. ¶ 13.) Plaintiff asked Defendant Thompson to have his door open, and Defendant Thompson said, "No, you talk to[o] much" and told Plaintiff that he would have to wait until the guard working the range returned from the bathroom. (Id. ¶ 14.) When the block sergeant called for count, officers came to Plaintiff's cell and he "locked in with no incident." (Id. ¶ 15.) Plaintiff avers that it was common for him not to be locked into his cell for evening count because of his job responsibilities. (Id. ¶ 16.) He maintains that he would be "alright" as long as he was outside of his cell for count. (Id.) Plaintiff has also submitted a declaration from Derek Hudzik, his cellmate at the time, supporting his version of events. (Doc. No. 77-1, Ex. B.) While Plaintiff's declaration amounts to little more than a recitation of the allegations he set forth in his complaint, it is nevertheless "an admissible form of evidence used to support factual positions during summary judgment." Shelton v. Bledsoe, 522 F. App'x 109, 112 (3d Cir. 2013) (per curiam). After all, the Third Circuit has "consistently said that a pro se inmate . . . 'is in a decidedly difficult position from which to generate record evidence' and that affidavits are about the best that can be expected' at the summary judgment stage." Id. (quoting Brooks v. Kyler, 204 F.3d 102, 108 n.7 (3d Cir. 2000)).

At the summary judgment stage, the Court must generally:

take the facts in the light most favorable to the non-moving party when disposing
of a summary judgment motion. However, a 'limited exception' to this general rule
exists where the nonmovant's version of the events may be disregarded to the extent
those facts are 'blatantly contradicted' by the summary judgment record.

Millbrook v. United States, No. 3:15-CV-0832, 2016 WL 4734658, at *9 (M.D. Pa. Sept. 12,

2016); see also Scott v. Harris, 550 U.S. 372, 380 (2007) (noting that "[w]hen opposing parties

tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment"). This Court has noted that "[w]hile video footage

has been found to establish this 'limited exception,' not all video footage or mechanical

depictions will allow a court to disregard the non-movant's version of the events." Millbrook,

2016 WL 4734658, at *9. For example, "courts have declined to apply the limited exception set

forth in Scott v. Harris where a videotape or other mechanical depiction does not capture the

whole incident . . ., or where the videotape or mechanical depiction is susceptible to multiple

reasonable interpretations." Patterson v. City of Wildwood, 354 F. App'x 695, 698 (3d Cir.

2009); see also Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 552 n.5 (M.D. Pa. 2008)

(concluding that audio recording did not qualify for the Scott limited exception because it was

susceptible to multiple reasonable interpretations), aff'd by 350 F. App'x 770 (3d Cir. 2009).

After reviewing the surveillance camera footage several times, the Court concludes that,

while relevant, it is inconclusive and does not blatantly contradict Plaintiff's account. As noted

above, in the misconduct, Defendant Thompson wrote that on June 1, 2017, he observed Plaintiff

"stopping at multiple cells on 5-Range both prior to & after [he] cleaned the 5-Range showers."

(Doc. No. 65-1, Ex. C.) This, however, is not depicted in the video footage provided to the

Court. Rather, the video footage appears to depict 4-Range. An inmate wearing what appears to

be a tan State-issued uniform walks down the range before stopping and waiting in front of one

cell.  Another inmate, wearing a white t-shirt, can be seen up the range; however, the footage does not clearly show whether this inmate was stopping at multiple cells.  At some point, the inmate in the white t-shirt is seen jogging back down the range, holding what appears to be a plastic bag, and disappears off camera.  Shortly thereafter, a correctional officer unlocks a cell door, and the inmate wearing the tan uniform enters the cell.  The video does not clearly show an inmate stopping at multiple cells.  Moreover, the Court cannot discern from the video which inmate is Plaintiff.

In light of the evidence presented by the parties, it is the Court's view that there exist genuine issues of material fact regarding whether the adverse action Plaintiff suffered is causally connected to his conduct in submitting a grievance against Defendant Thompson.  These issues of fact turn on a credibility assessment, a task in which this Court may not partake at the summary judgment stage.  See Anderson, 477 U.S. at 252.  While Defendants have submitted video footage purportedly supporting their version of events, as discussed above, that footage does not blatantly contradict Plaintiff's version.  Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant Thompson issued the misconduct to Plaintiff because of his conduct in submitting a grievance against him.  Accordingly, the Court will deny summary judgment as to Plaintiff's retaliation claim against Defendant Thompson.

### b.    Plaintiff's Retaliation Claim Against Defendant Sherman

As noted above, Plaintiff contends that Defendant Sherman retaliated against him by threatening to mark his grievance as frivolous if Plaintiff did not withdraw it.  (Doc. No. 1 ¶¶ 52, 98.)  Again, Defendants concede that Plaintiff engaged in protected activity by filing a grievance.  (Doc. No. 67 at 16.)  It is well settled, however, that verbal threats or verbal harassment, even if

acted upon, do not constitute adverse action for purposes of establishing a First Amendment retaliation claim. See, e.g., Burgos v. Canino, 358 F. App'x 302, 306 (3d Cir. 2009) (noting that "because threats alone do not constitute retaliation, the claim relating to the threat failed"); Reid v. Wakefield, No. 06-249, 2007 WL 954179, at *4 (W.D. Pa. Mar. 28, 2007) ("Verbal threats, whether acted upon or not, simply will not be sufficient to state a First Amendment claim."); Alexander v. Forr, No. 04-370, 2006 WL 2796412, at *4 (M.D. Pa. Sept. 27, 2006) ("Verbal abuse or threats do not constitute the type of adverse action sufficient to support a retaliation claim."); Bartelli v. Lewis, No. 04-0908, 2005 WL 2406048, at *2 (M.D. Pa. Sept. 29, 2005) ("[W]e determine that verbal threats do not constitute an 'adverse action' and, therefore, do not fulfill a requisite element of a retaliation claim."; Bartelli v. Bleich, No. 04-0899, 2005 WL 2347235, at *3 (M.D. Pa. Sept. 26, 2005) ("[M]ere verbal threats cannot be viewed as an 'adverse action' sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."). Accordingly, because Plaintiff cannot establish a requisite element of his retaliation claim against Defendant Sherman, Defendants will be granted summary judgment as to this claim.

### 3. Plaintiff's Due Process Claim

Plaintiff also claims that he was denied due process for retaliatory reasons during his misconduct proceedings. Specifically, Plaintiff alleges that Defendants Pilosi and Weller destroyed his written version of the events of June 1, 2017 and lied in the disciplinary report. (Doc. No. 1 ¶¶ 69-77, 107.) He maintains that he was coerced to plead guilty because otherwise he would be sent to the RHU. (Id. ¶¶ 75-77.)

Defendants' sole argument in support of summary judgment on this claim is that Plaintiff's sanctions—the loss of his job and twenty (20) days of cell restriction—do "not

constitute the requisite atypical and significant hardship to implicate a liberty interest to trigger due process protections." (Doc. No. 67 at 19.) They cite <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), in support of their argument. (<u>Id.</u> at 18-19.) In <u>Sandin</u>, the Supreme Court shifted the focus of the liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner. <u>Id.</u> at 481. The Court reasoned, <u>inter alia</u>, that "[d]iscipline by prison officials in response to a wide range of misconduct" is expected as part of an inmate's sentence. <u>Id.</u> at 485. Accordingly, the Court, focusing on the nature of the punishment instead of on the words of any regulation, held that the procedural protections in <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974),[11] were inapplicable because the "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." <u>Sandin</u>, 515 U.S. at 486. For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484.

Here, however, Plaintiff alleges that he was denied due process for retaliatory reasons. As Plaintiff correctly notes, the Third Circuit has held that "[r]etaliation may be actionable, however, even when the retaliatory action does not involve a liberty interest." <u>Allah</u>, 229 F.3d at 224 (quotations omitted). Thus, Plaintiff's claim is not foreclosed by <u>Sandin</u>.

---

[11] In <u>Wolff</u>, the Supreme Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." <u>Id.</u> at 556. However, the Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative; and (5) a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. <u>Id.</u>

The Third Circuit has recognized that "[p]rison disciplinary proceedings may . . . constitute a denial of due process in the context of a civil rights action under § 1983 when they are instituted for the sole purpose of retaliating against an inmate for his/her exercise of a constitutional right." Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002). Such a procedural due process claim requires threshold proof that the inmate was engaged in constitutionally protected conduct. See id. (citing Sandin, 515 U.S. at 486); see also Allah, 229 F.3d at 224. However, even if the discipline is initiated in retaliation for a protected act, due process is satisfied where the plaintiff has an opportunity to confront and challenge the retaliatory misconduct reports. See Smith, 293 F.3d at 653-54; see also Thomas v. McCoy, 467 F. App'x 94, 97 (3d Cir. 2012) (per curiam) ("Due process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly false misconduct reports."). Moreover, a retaliatory discipline claim fails when there is "some evidence" to support the determination. See Nifas v. Beard, 374 F. App'x 241, 244 (3d Cir. 2010) (citing Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994)).

Defendants have submitted copies of the documents relating to Plaintiff's disciplinary proceedings. In the disciplinary hearing report, Defendant Pilosi wrote that Plaintiff had offered no written version of the events, and that the hearing scheduled for June 14, 2017 was rescheduled to watch the video evidence. (Doc. No. 65-1 at 21.) Defendant Pilosi wrote that the "[v]ideo evidence clearly shows at 1549hrs [Plaintiff] had already handed in his mop bucket, walked past his cell and stops at 4025 cell for two minutes, then ran past his cell and went to 5 back to speak to another inmate at 1551 hrs." (Id.)[12] Two days later, on June 16, 2017, Plaintiff

---

[12] The video footage relied upon by Defendant Pilosi in her report was not provided to the Court. Rather, the only video footage provided to the Court by Defendants begins on June 1, 2017 at 15:51 hours and goes through 15:53 hours.

changed his plea to guilty, and Defendant Weller was a witness to his change of plea.  (Id.)  The undisputed facts establish that Plaintiff appealed and that the disciplinary decision was upheld throughout the appeal process.  (Doc. No. 68 ¶¶ 29-30.)

Plaintiff, however, avers in his declaration that during the misconduct hearing on June 16, 2017, Defendant Weller read his written statement and told Plaintiff that he had watched the video footage.  (Doc. No. 77-1, Ex. A ¶ 25.)  Plaintiff maintains that Defendant Weller specifically stated that Defendant Thompson had lied about what happened, but that Plaintiff had to "give [him] something."  (Id. ¶ 26.)  Plaintiff responded that it was clear that Defendant Thompson wrote the misconduct because he was mad at Plaintiff.  (Id. ¶ 27.)  Defendant Weller indicated that if Plaintiff pled guilty "then it [would] go easy with [him]."  (Id. ¶ 28.)  Ultimately, Defendant Pilosi yelled, "I care about how the . . . C/O lied on you, and that we were talking about you and if you [don't] plead guilty that I will send your ass to the RHU.  So what are you gonna do?"  (Id. ¶ 29.)  Plaintiff then unwillingly changed his plea because he did not "want to go to the hole."  (Id. ¶ 30.)  Plaintiff further avers that Defendant Pilosi "did not include [his] written version with her findings or even entered it into the record at all."  (Id. ¶ 33.)

Given this, it is the Court's view that there exist genuine issues of material fact regarding whether Plaintiff received due process with respect to his misconduct proceedings.  Again, such issues of fact will likely turn on a credibility assessment, which the Court may not undertake at this stage.  See Anderson, 477 U.S. at 252.  Moreover, the video footage cited by Defendant Pilosi in her report was not provided to the Court.  Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Plaintiff was denied due process with respect to this misconduct.  Accordingly, the Court will deny summary judgment as to Plaintiff's due process claim.

### 4.     Plaintiff's Conspiracy Claim

Plaintiff next claims that Defendants Sherman, Pilosi and Weller[13] conspired to "cover up" the actions of Defendant Thompson by making it difficult for him to proceed through the administrative appeal process.  (Doc. No. 1 ¶¶ 111-17.)  Defendants assert that they are entitled to summary judgment because Plaintiff has only provided "bare conclusory allegations" to support his conspiracy claim.  (Doc. No. 67 at 19-20.)

In order to demonstrate a civil conspiracy, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'"  Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)), abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa., 316 F.3d 392, 400 (3d Cir. 2003).  However, "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy.  The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred."  Flanagan v. Shively, 783 F. Supp. 922, 928 (M.D. Pa. 1992).  The plaintiff's allegations "must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each Defendant allegedly played in carrying out those objectives."  Id.  A plaintiff cannot rely on subjective suspicions and unsupported speculation.  Young v. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991).  Moreover, "to successfully counter a motion for summary judgment, a plaintiff must provide specific evidence establishing that

---

[13] Plaintiff also names Defendant Garman in this cause of action (see Doc. No. 1 at 22), but provides no specific allegations against him with respect to the alleged conspiracy.  Moreover, as discussed supra, Plaintiff has not demonstrated how Defendant Garman was personally involved in the alleged violations of his rights.

defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose." Payne v. Gordon, 3:17-cv-1230, 2018 WL 3649026, at *11 (M.D. Pa. Aug. 1, 2018).

Here, the Court agrees with Defendants that Plaintiff has failed to introduce into the record any evidence which shows an agreement or plan created and executed by Defendants Sherman, Pilosi, and Weller that rises to the level of a conspiracy.  In a conclusory fashion, Plaintiff alleges that Defendants Weller and Pilosi agreed that the misconduct issued against him by Defendant Thompson was not true, but that he would be sent to the RHU if he did not plead guilty.  (Doc. No. 77 at 17.)  He also asserts that "[i]n the complaint there was enough evidence . . . to establish a claim of the meeting of the minds in [furtherance] of punishing [him] along with the destruction of the written version submitted by [him] that he had to reproduce on his own for appel[l]ate review . . . and also the spoliation of the video footage in relation to what was requested to be preserved by [him]."  (Id. at 18.)  These assertions, however, fail to reasonably suggest the presence of an agreement or concerted activity between Defendants Sherman, Weller, and Pilosi to "cover up" Defendant Thompson's actions.  Without more, Plaintiff's conspiracy claim amounts to nothing more than mere conjecture and bare speculation, which is not sufficient to demonstrate a genuine issue of fact as to the existence of an agreement designed to deny his constitutional rights.  See Young, 926 F.2d at 1405 n.16.  Accordingly, the Court will grant summary judgment to Defendants as to Plaintiff's conspiracy claim.

### 5. Plaintiff's Defamation Claim

Finally, Plaintiff alleges that Defendant Sherman defamed his character by "paint[ing] him] as a fabricator, or as an inmate that cannot be trusted."  (Doc. No. 1 ¶ 119.)  He asserts that Defendant Sherman came to his "living qua[r]ters and in front of many housing prison staff and other inmates called [him] a liar and defamed [him] knowingly for a purposed effect."  (Id.

¶ 120.)  Defendants argue that because all of Plaintiff's federal claims should be dismissed, the Court should decline to exercise supplemental jurisdiction over this claim.  (Doc. No. 67 at 20-21.)  The Court, however, has determined that Defendants are not entitled to summary judgment with respect to Plaintiff's retaliation claim against Defendant Thompson and his retaliatory due process claim against Defendants Pilosi and Weller.  Accordingly, the Court will consider the merits of Plaintiff's retaliation claim below.

Defamation is an intentional tort in the Commonwealth of Pennsylvania.  <u>Joseph v. Scranton Times, L.P.</u>, 959 A.2d 322, 334 (Pa. Super. Ct. 2008).  "Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, . . . the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity."  1 Pa. C.S. § 2310.  "The Pennsylvania legislature has not chosen to waive this immunity for intentional torts."  <u>Wicker v. Shannon</u>, No. 3:CV-09-1629, 2010 WL 3812351, at *9 (M.D. Pa. Sept. 21, 2010) (citing 42 Pa. C.S.A. § 8522).  Here, the undisputed facts indicate that Defendant Sherman was acting within the scope of his duties when he purportedly defamed Plaintiff.  Moreover, because state corrections officers are protected from intentional tort claims, such as defamation, Plaintiff's defamation claim is not cognizable under § 1983.  <u>See</u> <u>Miller v. Trometter</u>, No. 4:11-CV-811, 2012 WL 5933015, at *5 (M.D. Pa. Nov. 27, 2012); <u>see also</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976).  Accordingly, Plaintiff's defamation claim will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motion for summary judgment.  (Doc. No. 65.)  Specifically, the Court will grant Defendants'

motion with respect to Plaintiff's claims against Defendants Wetzel and Garman, his First Amendment retaliation claim against Defendant Sherman, his conspiracy claim against Defendants Sherman, Pilosi, and Wetzel, and his defamation claim against Defendant Sherman. The Court will deny Defendants' motion with respect to Plaintiff's First Amendment retaliation claim against Defendant Thompson and his retaliatory due process claim against Defendants Pilosi and Weller.  An appropriate Order follows.